UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

MARQUISE GORDON, # 644808,          )
                                    )
                 Petitioner,        )          Case No. 1:10-cv-897
                                    )
v.                                  )          Honorable Robert Holmes Bell
                                    )
SHERRY BURT,                        )
                                    )
                 Respondent.        )
_____ )

## OPINION

This is a habeas corpus proceeding brought by a state prisoner pursuant to 28

U.S.C. § 2254.  Petitioner's conviction arises out of events that occurred on the evening

of January 19, 2006.  Petitioner and three other men took Alicia Hockaday from her

residence to an abandoned house where she was sexually assaulted.  Ms. Hockaday

was eighteen years old, but her mental functioning was at the level of a seven or eight

year old.  On April 12, 2007, a jury found petitioner guilty of third-degree criminal

sexual conduct.  MICH. COMP. LAWS § 750.520d(1)(c).  On June 28, 2007, Judge Dennis

B. Leiber sentenced petitioner to six to fifteen years' imprisonment.[1]  The Michigan

---

[1]Petitioner obtained release on parole sometime before August 8, 2014.  (ECF
No. 26).  Petitioner neglected to keep the Court apprised of his address.  (*Id.*).  It
appears that his parole was revoked.  Michigan Department of Corrections records
indicate that petitioner is currently an inmate at the Ojibway Correctional Facility
(OCF).  In any event, petitioner met the "in custody" requirement of 28 U.S.C. § 2254
when he filed his habeas corpus petition.  *See Maleng v. Cook*, 490 U.S. 488, 490-91
(1989).

appellate courts affirmed his conviction.  He now seeks federal  habeas corpus relief on

the following grounds, which were rejected by Michigan's courts:

    I.     Petitioner was denied his right to a fair trial by prosecutorial misconduct.

    II.    Petitioner was denied the effective assistance of trial counsel.

    III.   Petitioner was denied his right to cross-examine the victim.

    IV.   The trial court erroneously admitted a statement that petitioner made to police after he had requested counsel.

(Petition, ECF No. 1, PageID.5-10).

Respondent argues that relief should be denied on Ground I because petitioner's claims of prosecutorial misconduct are barred by procedural defaults, not overcome by a showing of cause and prejudice or actual innocence. (Answer at 9-12, ECF No. 5, PageID.60-63). Further, respondent argues that all grounds raised by petitioner should be denied for lack of merit. (*Id.* at 18-39, PageID.69-90).

After review of the state-court record, the Court concludes that petitioner has failed to establish grounds for federal habeas corpus relief. Accordingly, the petition will be dismissed for lack of merit in the grounds presented.[2]

---

[2]This Court has discretion to ignore a procedural default and proceed directly to the merits of an apparently defaulted claim, when to do so would be more expeditious than an analysis of the complicated procedural default question. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Bales v. Bell*, 788 F.3d 568, 573 (6th Cir. 2015); *Scott v. Houk*, 760 F.3d 497, 506 (6th Cir. 2014). In the present case, the grounds raised by petitioner are meritless, so a detailed analysis of the complicated procedural default issues is unnecessary.

### Standard of Review

This matter is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (*per curiam*); *Felkner v. Jackson*, 562 U.S. 594, 597 (2011) (*per curiam*); *Renrico v. Lett*, 559 U.S. 766, 773 (2010). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). "State-court factual findings [] are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)). AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). It prohibits "using federal habeas corpus review as a vehicle to second-guess the

reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (*per curiam*).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see Burt v. Titlow*, 134 S. Ct. 10, 16 (2013); *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786-87 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 562 U.S. at 102-03 (citation and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see White v. Wheeler*, 136 S. Ct. 456, 460 (2015); *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014); *Davis v. Ayala*, 135 S. Ct. at 2198.

The only definitive source of clearly established federal law for purposes of § 2254(d)(1) is the holdings—not dicta—of Supreme Court decisions. *White v. Woodall*, 134 S. Ct. at 1702; *see Woods v. Donald*, 135 S. Ct. at 1377 ("Because none of our cases

confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court."). "[W]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Id.* (quotations and internal citations omitted).

An unreasonable application of the Supreme Court's holding must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Harrington v. Richter*, 562 U.S. at 103). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' " and "[i]t therefore cannot form the basis for habeas relief under AEDPA." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (quoting *Parker v. Matthews*, 132 S. Ct. at 2155); *see Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (*per curiam*) ("As we have repeatedly emphasized, [] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'").

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Section 2254 (d)(2) requires that this Court

accord the state trial court substantial deference.  If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination.  *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *Burt v. Titlow*, 134 S. Ct. at 15.

### Findings of Fact

### A.    Circuit Court Proceedings

Petitioner was charged with two counts of third degree sexual conduct.  Count I charged petitioner with 3rd degree criminal sexual conduct for engaging in oral sex with Alicia Hockaday, a woman he knew or had reason to know was mentally incapable of giving consent.  Count II was a charge of 3rd degree criminal sexual conduct against petitioner for engaging in forced vaginal and/or anal intercourse with Ms. Hockaday. (ECF No. 17).

Petitioner's trial in Kent County Circuit Court began on April 3, 2007, and it ended on April 12, 2007, with the jury finding him guilty on Count I and not guilty on Count II.  (Trial Transcripts (TT I to TT VII).[3]  After the jury was selected and sworn, Judge Leiber delivered a series of instructions.  He gave the jury a roadmap of how the trial would proceed, including opening statements and closing arguments.  "The trial follows this procedure: first, the prosecutor makes an opening statement where he gives his theories about the case.  The defendant's lawyer does not have to give an

---

[3]The Rule 5 materials contain a number of partial transcripts.  (ECF No. 11, 12, 14, 16).  The page numbering of the partial transcripts is not consistent with the page numbering of the full transcripts.  All the citations herein are to the full transcripts.  (*See* TT I, ECF No. 9; TT II, ECF No. 10; TT III, ECF No. 13; TT IV, ECF No. 15, TT V, ECF No. 17, TT VI, ECF No. 18; TT VII, ECF No. 19).

opening statement, but he may make an opening statement after the prosecutor makes his, or he may wait until later.  These statements are not evidence.  They are only meant to help you understand how each side views the case. . . .  After all the evidence has been presented, the prosecutor and the defendant's lawyer will make their closing arguments.  But just like the opening statements, these are not evidence.  They are only meant to help you understand the evidence and the way that each sides sees the case.  You must base your verdict only on the evidence." (TT I, 133-34).  Judge Leiber advised the jury that the attorneys' questions were not evidence.  "Only the answers are evidence."  (*Id.* at 136).  Before the assistant prosecutor began his opening statement, Judge Leiber again reminded jurors that the opening statement was not evidence, but only an opportunity for the prosecution to express what it anticipated the evidence would be and the prosecution's theory of the case.  (TT II, 3).

The prosecutor, Kevin Bramble, delivered his opening statement without objection.  (*Id.* at 3-11).  Defense counsel reserved his opening statement.  (*Id.* at 11).

Darrel Smith testified that people called him "Junior."  (*Id.* at 113).  He knew petitioner and identified him in the courtroom.  (*Id.* at 100).  On the night of January 19, 2006, petitioner, Darrell Smith, Walter Jenkins, and Kevin Smith, traveled by car to Alicia Hockaday's home.  (*Id.* at 103-04).  Walter Jenkins was 23 years old, about 6' 2" tall, and weighed about 230 pounds.  (TT III, 64).  Petitioner is smaller than Jenkins.  (*Id.*).  Petitioner was driving his Cadillac.  Smith gave Alicia Hockaday's phone number to Jenkins.  (*Id.* at 62).  Jenkins called Ms. Hockaday on the phone and persuaded her to come outside.  She came out in her pajamas, and left her

-8-

residence with petitioner and the other three men in petitioner's car.  (TT II, 104-05; TT III, 66, 96).  Ms. Hockaday was taken to an abandoned two story house that had no electricity.  Petitioner had the keys to the house.  (TT III, 67-69).

Petitioner and Jenkins took Ms. Hockaday upstairs.  (TT II, 108; TT III 70).  There was a bed upstairs, but otherwise the house lacked furniture.  Darrel Smith and Kevin Smith sat on the stairs.  (TT II, 107-110).  Darrel Smith indicated that Ms. Hockaday was slow.  (*Id.* at 110, 134).  Kevin Smith testified that he knew that Ms. Hockaday was slow and that it was not difficult to figure out.  (TT III, 60-61, 102).

Darrel Smith testified that he went upstairs and told petitioner and Walter Jenkins that what they were doing to Ms. Hockaday was not right.  He testified that he saw petitioner anally sexually penetrate the victim.  (TT II, 100-01, 110-11).  Ms. Hockaday's clothes were off and she didn't look like she was having fun.  (*Id.* at 114).  He also testified that he had also seen petitioner and Walter Jenkins penetrate the victim's mouth with their penises.  (*Id.* at 116-17, 130-31).  Darrel Smith left the room and resumed sitting on the stairs with Kevin Smith.  (*Id.* at 112).  Later, Walter Jenkins came back downstairs, then petitioner, and eventually Ms. Hockaday.  (*Id.* at 115).  They all got back into petitioner's car and petitioner drove to Dunham Street where they dropped off Ms. Hockaday.  (*Id.*).

Alicia Hockaday testified.  She had difficulty remembering to give verbal answers and she had to be reminded to speak into the microphone so that she could be heard.  (*Id.* at 16-20, 23, 59-60, 80).  In addition, Ms. Hockaday blurted out "I hate this," when called upon to provide testimony describing what had been done to her on

the night in question. (*Id.* at 30). She required a number of breaks during her testimony. (*Id.* at 30, 66). While the judge was in the process of making a ruling on an objection, Ms. Hockaday blurted out: "I'm a stupid girl." (*Id.* at 64).

Ms. Hockaday testified that she knew "Junior" (Darrel Smith) and Kevin Smith, but she did not know petitioner or Walter Jenkins. (*Id.* at 47). She had never seen petitioner or Walter Jenkins before January 19, 2006. (*Id.* at 29). She identified petitioner in the courtroom and indicated that he had been the driver. (*Id.* at 20-21). Petitioner and the other man she did not know took her upstairs. (*Id.* at 19). She testified that petitioner put his private part into her mouth. (*Id.* at 24). She also testified that petitioner put her on the bed and raped her. (*Id.* at 22). She related that petitioner put his private part in her butt. (*Id.* at 24). She indicated that the other man put his private part into her private part. (*Id.* at 25). She stated that the men tried to scare her by saying "get a gun" and that if she told anyone they were going to rape her again. (*Id.* at 25-26). She indicated that the men took her to Kalvell's house on Dunham Street where they dropped her off. (*Id.* at 27). She attempted to get home from there.

Kalvell's sister brought Ms. Hockaday to a bus stop and Ms. Hockaday attempted to take a city bus home. (*Id.* at 28). Ms. Hockaday's mother found her. She told her mother what had happened and she was taken to be examined by a nurse. (*Id.* at 28-29, 63).

Defense counsel's cross and recross-examination of Ms. Hockaday was extensive. (*Id.* at 38-91, 95-97). When Ms. Hockaday was questioned by petitioner's attorney on

whether she had "practiced" what she might say in court with Detective Rogers, the victim's response was that she had been told to tell the truth. (*Id.* at 45). Petitioner's attorney was able to elicit a gesture from Ms. Hockaday indicating that she had met with Detective Rogers twenty to thirty times. (*Id.*). Ms. Hockaday testified that, on January 19, 2006, she had been taken from her home to an abandoned house by four men. (*Id.* at 56, 68). She knew "Junior" (Darrell Smith) and Kevin Smith, but she did not know the other men. She tried to run away but could not. One of the unknown men removed her clothes. (*Id.* at 72-74). She indicated that she had been raped by the two men that she didn't know. (*Id.* at 69, 80). She told them to stop. (*Id.* at 76-77). "Junior" and Kevin Smith tried to stop them. (*Id.* at 76, 78).

As Judge Leiber was concluding his ruling on an objection made during cross-examination, Ms. Hockaday stated: "Hate this." (TT II at 82). Shortly thereafter, defense counsel elicited testimony from Ms. Hockaday indicating that the big guy, Walter Jenkins, did things to her, but the second guy, petitioner, did not. (*Id.* at 82-85). Judge Leiber sustained objections to defense counsel's subsequent questions of this witness, questions which were made under the premise that counsel wanted to be "sure" of her testimony:

> Q.    I just want to make sure of some things. Now you don't remember
>       who that other man is.
>
> A.    Nope.
>
> MR. BRAMBLE:    Objection. Asked and answered now five times. Are
>                we going to cut to the chase here? I mean, it's pretty
>                clear what's going on here, your Honor.

THE COURT:        Well, I'm not certain that's responsive.

MR. BRAMBLE:      I'm going to object.  It's asked and answered.

THE COURT:        I will sustain the objection.  The question has been asked; the witness has given her answer.  And we should proceed to other matters that haven't already been explored, please.

BY MR. LYKINS:

Q.      Did this other man do anything to you?

A.      No.

MR. BRAMBLE:      Objection.

THE COURT:        Sustained.

MR. BRAMBLE:      Asked and answered.

THE COURT:        Sustained.

THE WITNESS:      Okay.

THE COURT:        The jury is instructed, just disregard the question.

(*Id.* at 84-85).

Ms. Hockaday testified that she would tell the truth in her responses to petitioner's attorney's questions.  (*Id.* at 39).  She also gave a response indicating that if the attorney used big words that she did not understand, she would let him know. (*Id.* at 42).  She related that she sometimes had difficulty telling time, and that she didn't like "those round clocks."  (*Id.* at 59).  When she was asked to provide a physical description of one of the men, Ms. Hockaday's response was, "I don't get that."  (*Id.* at 82).  The following exchange occurred during the course of cross-examination:

-12-

Q.      Have you ever had a history of not telling the truth?

MR. BRAMBLE:      I'm going to object.

THE COURT:      On what grounds?

MR. BRAMBLE:      Relevance.  How does this girl know what a history is of telling the truth or not telling the truth?

THE WITNESS:      I want to be done.

THE COURT:      Excuse me.  Did you have a comment for me?

MR. LYKINS:      No, your Honor.

THE COURT:      Thank you.  I'll sustain the objection, because the question of credibility is exclusively that for the jury to determine.  And the question may be outside the witness's competence.

(*Id.* at 91).

Petitioner's attorney elected against asking follow-up questions of Ms. Hockaday, but he effectively explored the issue of Ms. Hockaday's credibility during the cross-examination of Ms. Hockaday's  mother:

Q.      When you're saying she has difficulty saying the truth, are you saying she's a liar?

A.      I'm saying that she doesn't always tell the truth, that she sometimes lies.

Q.      Okay.  So in situations there's a possibility, in all situations, that she's capable of lying?

A.      Yes.

(TT III, 33-34).  Petitioner's attorney was able to explore the matter even further on recross-examination of Ms. Hockaday's mother. (*See id.* at 46-47).

Ms. Hockaday's mother testified that Ms. Hockaday is very slow and that she functions at the level of a seven or eight year old.  Ms. Hockaday attended special education classes.  (TT II at 11-14).  Her mother indicated that it took very little time for someone coming into contact with Ms. Hockaday to recognize that she has mental deficits and that she is vulnerable to others taking advantage of her mental limitations.  (*Id.* at 25-27, 37).

On the night of January 19, 2006, Ms. Hockaday's mother was away and she had left Ms. Hockaday in the care of her brother and an older adult friend.  (*Id.* at 15).  Ms. Hockaday was able to sneak out of the house.  (*Id.* at 16, 41).  When Ms. Hockaday's mother discovered that she was missing, she called the police.  (*Id.* at 16).  On that January night, Ms. Hockaday's mother found her not far from home, walking up the street in her pajamas and sandals.  (*Id.* at 17-18).  Ms. Hockaday began crying and reported to her mother that she had been raped.  (*Id.* at 18).  Ms. Hockaday was taken by ambulance to the hospital, and from there, she and her mother were directed to the YMCA where a nurse performed an examination.  (*Id.* at 19-20).

Kim Hartuniewicz, a female police officer, was called in to interview Ms. Hockaday because Ms. Hockaday was not comfortable bing interviewed by a male officer.  Officer Hartuniewicz quicky recognized that the victim was mentally impaired. (TT IV, 8-10).  She could not speak to Ms. Hockaday on the level that an 18-year-old woman would understand.  She had to speak to Ms. Hockaday like she would a child victim.  (*Id.* at 11).  During a portion of direct examination of Officer Hartuniewicz, the

prosecutor referenced Officer Perdue's report and his question is presented in context

below:

> Q.     All right, I want you to describe your observations of Alicia
>        Hockaday.
>
> A.     . . . I've interviewed many female victim's of sexual assault. . . .
>        I have a set way that I approach them. I try to explain why I'm
>        there and that I'm there to help them. . . . [A]fter a very short
>        period of time into the interview, I – I felt that Alicia was not – she
>        was an 18-year-old woman, I was aware of that, but she did not
>        seem to be of that capacity mentally when I was asking her
>        questions.
>
> Q.     Okay. I'm looking at Officer Perdue's report. And in the first line
>        he talks about going to interview an 18-year-old mentally
>        challenged female; and that's Officer Perdue's report. Did it
>        become aware to you that she had some deficits or was mentally
>        challenged, as described in this report.
>
> A.     It was not, um, made aware prior to getting to the hospital. Um,
>        I was not told she was mentally impaired by Dispatch.   Um, I
>        wasn't told by anybody. It was just after I stated talking to her
>        that I realized she is not – was not of the capacity, in my opinion,
>        of what an 18-year-old woman should be. I've interviewed many
>        women over the years, victims of sexual assault; and she just – she
>        was not of – to me it didn't seem that she was of that capacity.
>
> Q.     Once you came to that – and you said that you came to that
>        conclusion fairly quickly in your contact with her?
>
> A.     Yes.
>
> Q.     Can you explain to the jury, how did that change, then, the way
>        you interviewed her?
>
> A.     Um, I – I found myself having to speak to her like I would speak
>        to a child. Um, I've interviewed children that have been victims of
>        sexual assault. And I found that I could not speak to her on the
>        level of an 18-year-old young woman would be able to comprehend;
>        I had to speak to her like I would speak to a child victim.

(*Id.* at 10-11).  No objections were made to this line of questioning.

-15-

A sexual assault nurse examiner testified that very quickly, almost immediately, she recognized that the victim had a learning disability.  (TT III, 112).  The victim indicated that she had been raped (penile-vaginal intercourse) by the larger man and that both men had forcibly entered her mouth with their penises.  (*Id.* at 113-14).  The nurse examiner testified that her medical findings were consistent with the victim's report.  (*Id.* at 118-19).  Ms. Hockaday also indicated that the bigger man had tried anal penetration with his penis.  (*Id.* at 124-25).

Detective Kristin Rogers of the Grand Rapids Police Department testified that she interviewed Alicia Hockaday.  It was apparent that Ms. Hockaday was not functioning at her age level.  (*Id.* at 84-85).  Detective Rogers interviewed Darrel Smith and Michael Smith at their school.  (TT IV, 86).  She interviewed Walter Jenkins.  (TT IV, 86).  She interviewed petitioner on February 1, 2006.  She had obtained information from Darrell Smith and Kevin Smith earlier in the day regarding the location of house where the events on the night of January 19, 2006, had occurred.  She and another officer went out to that location.  Rogers saw petitioner arrive and park in front of a house located on Kalamazoo Avenue.  Petitioner's vehicle matched the descriptions provided by Alicia Hockaday, Walter Jenkins, and Darrell Smith.  (*Id.* at 86-88).

Because of the cold weather, petitioner was interviewed inside Detective Roger's car.  It was a regular car; not one with lights and cages.  The interview was recorded

and played for the jury.  (*Id.* at 89-95).  During this interview, petitioner denied being

at the house.  (*Id.* at 90).[4]

On May 16 and 17, 2006, petitioner gave a second statement to Detective Rogers.

Petitioner was in custody and had been advised of the *Miranda* warnings before he

made this statement.  (*Id.* at 91,101).  Outside the presence of the jury, Judge Leiber

took up petitioner's motion to suppress a portion of this statement.  (*Id.* at 73-78).

Judge Leiber noted that the issue before him was whether petitioner had unequivocally

and unambiguously requested counsel during the custodial interrogation, citing the

Supreme Court's decisions in *Smith v. Illinois*, 469 U.S. 91 (1984) and *Davis v. United*

*States*, 512 U.S. 452, 456-62 (1994).  Judge Leiber found that petitioner did not make

an unambiguous request for counsel, and he denied petitioner's motion to suppress:

> As I read the transcript presented of some eight and a quarter pages
> constituting the time of 13 minutes and 22 seconds to 24 minutes and 15
> seconds, I found the disputed reference on page 4, and, then shortly
> thereafter at page 6 something very closely akin to what Mr. Gordon had
> said previously.  Mr. Gordon here at page 6 says, and I'm quoting, "The
> thing is – is that I don't wanna speak on nothin' like that because
> whatever I say, just like you say, can be used in court," end quote.
>
> The phrase, "I don't wanna speak on this" is repeated, "I don't wanna
> speak on this."  Is this because he is requesting counsel?  Or, specifically,
> I don't wanna speak on this because his lawyer's not there.  Or is it
> because he doesn't want to speak on this because, as he says two pages
> later, it's because anything he says of an incriminating nature may be
> used against him in a court of law?
>
> I don't know the answer to that.  But it's clearly evident that that the
> same phrase which is the subject of the motion had an express reason

---

[4]Petitioner presented a transcript of this statement as Appendix A to his brief
in the Michigan Court of Appeals.  (ECF. No. 21).  The transcript indicates that
petitioner denied any knowledge of the January 19, 2006, incident.

some two pages later in the context of the first utterance of "I don't wanna speak on this." I cannot say that this is unequivocal. In fact, it is ambiguous. And I do not see in the first statement that "I don't wanna speak on this and my lawyer is not here, and I can't talk to my – you know what I'm sayin'? – my lawyer 'cuz" is an incomplete statement; and I don't know what the 'cuz is, and what the because or the reason why is. All I know is that the lawyer isn't there. But it's clear to me that just the next page over – and, again, I don't know how much time elapses between there comments – but at page 7 Mr. Gordon says, and I'm quoting, "All right. This – this is – this is the thing. I'm gonna go ahead and – I'm gonna tell you this, you know, I'm gonna tell you," end quote.

Clearly that is an affirmative statement of his desire to answer questions, not in response, I think to any kind of badgering on the part of the detective, not really in response to a specific series of questions, but simply contemporaneous dialogue of the nature of which began on page 1 and continues through page 9.

So, is that phrase sufficient in the Court's opinion for Detective Rogers to have ceased questioning? No. Is it unambiguous and unequivocal? No. It is, at best, ambiguous; and it is similar in phrase and reason to an utterance made by the defendant shortly after on page 6, which indicates the reason that he is reluctant to speak is a fear that he may say incriminating statements. The motion to suppress defendant's statements after minutes 17 and 30 seconds is respectfully denied and is preserved.

(TT IV, 76-78).

In his second statement, petitioner abandoned his claim that he had not been present. He admitted that he was present at the house on Kalamazoo Avenue on the night in question with Alicia Hockaday, Walter Jenkins, Darrell Smith, and Kevin Smith. (*Id.* at 91). The recording was played for the jury.[5] (TT V, 11-13). The prosecutor asked Detective Rogers whether petitioner had indicated at the end of the

---

[5]A partial transcript of petitioner's second statement appears as Appendix B to petitioner's Brief in the Michigan Court of Appeals. (ECF No. 21).

tape that he did not want to talk about whether or not clothes came off.  He received

a non-responsive answer, and the assistant prosecutor did not ask follow-up questions:

> Q.      Detective, where you specifically asked the defendant about whether or not clothes came off at the end of this tape, did he indicate he didn't want to talk about that?
>
> A.      He said he wanted to wait until he had his lawyer.
>
> Q.      How many times did you meet with the victim?
>
> A.      I met her on February 20th, the day after the incident, I'm sorry, January 20th, the day after the incident, to interview her.  I met her on February 9th when she came down to the police department to get prints done, and then I met her again at the prelim, and that was back in May of 06, and I have not seen her again until the morning of trial.
>
> Q.      So this idea that you met her on several times, 30 times or how many was discussed during this testimony, accurate or inaccurate?
>
> A.      Inaccurate, untrue.

(*Id.* at 13).

During cross-examination, defense counsel elicited testimony from Detective

Rogers regarding petitioner's criminal record.  Detective Rogers testified that

petitioner had a history of misdemeanor convictions.  None of his prior convictions were

for assaults.  (*Id.* at 21-23).  Cross-examination of Detective Rogers also included

questions regarding the number of times she had seen Alicia Hockaday.  Questioning

established that these included the preliminary examinations of Walter Jennings and

petitioner.  Detective Rogers testified that Ms. Hockaday had not been carrying a teddy

bear at either preliminary examination.  She testified that she remembered that Ms.

Hockaday had a teddy bear during her testimony at trial.  Detective Rogers had not

advised her to come into the courtroom with a teddy bear.  (*Id.* at 40-41).  Defense counsel's cross-examination of Detective Rogers focused on inconsistencies in various statements provided by Alicia Hockaday.  (*Id.* at 28-33).

At the close of the prosecution's proofs, petitioner's attorney made a motion for a directed verdict.  (*Id.* at 49).  Judge Leiber denied the motion, finding that there was sufficient evidence on which a reasonable jury could find petitioner guilty on both criminal charges.  (*Id.* at 50).

Defense counsel advised Judge Leiber that he did not intend to call any witnesses, and that he would not be making an opening statement.  (TT VI, 4-5).  In his closing argument, the prosecutor reviewed the elements of the charges against petitioner and the evidence supporting a jury verdict finding petitioner guilty on both charges.  (*Id.* at 5-21).  He dealt with inconsistent testimony elicited from Ms. Hockaday by defense counsel during cross-examination by arguing that it had been the product of fatigue produced by lengthy cross-examination and leading questions posed to a witness of limited intellect:

> Third, if you get a detective willing to pursue and investigate this, then the last line of defense, you have a defense attorney – and I mean no slight to Mr. Lykins here – who can get up and keep her up on the stand for three hours and get her to capitulate here.  I mean no slight to Mr. Lykins here.  But any attorney can get up and get Alicia Hockaday spinning in her chair.  You saw her in some sense deteriorate and in some sense put her head down and give in.
>
> You heard her testimony, that she's very careful – we have a person of childlike innocence.  In asking her questions, you don't want to lead them.  You have to be careful.  I submit that when your in a position where you can lead Alicia Hockaday, she's going to eventually do just what she did.  She's going to fold up her tent and capitulate.

(*Id.* at 9-10).

-20-

Defense counsel's closing argument emphasized the prosecution's burden of proof and how the evidence presented fell short of meeting that burden. (*Id.* at 21-38). Among other things, he argued that, if the jury determined that a sexual act occurred and that Alicia Hockaday was incapable of consent, the evidence did not show beyond a reasonable doubt that petitioner knew or should have known of that incapacity. (*Id.* at 31-37). Defense counsel argued that to the extent that the prosecutor suggested that defense counsel's jobs was to spin things, defense counsel had a duty and responsibility to represent his client. (*Id.* at 24, 27). He was "troubled" that Alicia Hockaday had a teddy bear in the courtroom: "When they have her come up here the way they did – and I'll submit somebody put a Teddy Bear into her hand. I don't think Kevin Bramble did it. I know detective Rogers didn't do it. Somebody did, and I know she didn't walk around with a Teddy Bear because she's in high school. She's living with peer pressure. My son does not take a Teddy Bear to school. A five-year-old does, but she's in high school. I was troubled by that." (*Id.* at 29).

The prosecutor delivered his rebuttal argument. (*Id.* at 38-46). It included a response to defense counsel's argument about spinning the facts: "[H]e talks about spinning things or implicating that I'm spinning things. Let me make clear. I don't have to spin anything. Our roles are different here. If you look at the cannons of ethics that govern, as a prosecutor, I have a duty to seek justice. The defense's role is to zealously represent his client regardless of anything else, zealously represent his client. I don't have to put a spin on any of the facts here. They are awful enough as presented. I don't have to spin them at all." (*Id.* at 38-39).

Judge Leiber delivered his instructions and there were no objections. (*Id.* at 47-68). Among other things, Judge Leiber reminded the jury that the lawyers' questions and arguments were not evidence. (TT VI, 50). On April 12, 2007, the jury found petitioner guilty on the charge of third-degree criminal sexual conduct against a victim mentally incapable of consent, and it found petitioner not guilty of the charge of third-degree criminal sexual conduct involving the use of force or coercion. (TT VII, 3-5).

On June 28, 2007, Judge Leiber conducted a sentencing hearing. (Sentencing Transcript (ST), ECF No. 20). He expressed his agreement with the jury's verdict:

> [T]he jury, hearing all the evidence in this case, was convinced, as I am, that you are guilty of sexual assault on this young woman whose mental age is significantly less than her physical age or biological development. Clearly to anyone who had any time to observe would know that this girl was mentally incapacitated.
>
> The fact that she came out in January out there dressed as she was with her notebook and the like, and the manner in which she spoke and the things she did clearly show that she wasn't a person who was like any other 18-year-old at the time. So I don't think that there's any question about that.
>
> And clearly she testified – and I heard her testify over a significant period of time, in which she was thoroughly cross-examined, and I have to say that I agree with the verdict in this case independently based on what I heard.

(ST, 4-5). Judge Leiber sentenced petitioner to six to fifteen years' imprisonment. (ST, 5-6; *see* Judgment of Sentence Commitment to the Michigan Department of Corrections, found in Michigan Court of Appeals Record, ECF No. 21).

## B.     Appellate Proceedings

Petitioner filed an appeal in the Michigan Court of Appeals.  Petitioner was represented by Attorney Peter Ellenson.  Petitioner argued that his conviction should be overturned on the following grounds:

I.     THE PROSECUTOR COMMITTED MISCONDUCT AND DEPRIVED MR. GORDON OF HIS RIGHT TO A FAIR TRIAL.

    A.     THE PROSECUTOR AND THE DETECTIVE REHEARSED THE COMPLAINANT BEFORE TRIAL.  THE PROSECUTOR LED THE COMPLAINANT THROUGH HER TESTIMONY.  THE PROSECUTION – OR AN AGENT OF THE PROSECUTION – GAVE THE WITNESS A TEDDY BEAR TO HOLD DURING HER TESTIMONY.

    B.     THE PROSECUTOR IMPROPERLY USED THE PRETRIAL, HEARSAY STATEMENTS OF *RES GESTAE* WITNESS DARRELL SMITH AND LED HIM TO GIVE INCRIMINATING TESTIMONY.

    C.     THE PROSECUTOR BLATANTLY INTERJECTED HIGHLY PREJUDICIAL HEARSAY STATEMENTS INTO THE PROCEEDINGS.

    D.     THE PROSECUTOR ELICITED TESTIMONY FROM DETECTIVE ROGERS THAT MR. GORDON REQUESTED COUNSEL DURING THE INTERROGATION, THEREBY VIOLATING MR. GORDON'S RIGHT TO COUNSEL AND RIGHT TO REMAIN SILENT.

    E.     IN CLOSING ARGUMENT, THE PROSECUTOR ACCUSED DEFENSE COUNSEL OF KEEPING THE VICTIM ON THE STAND FOR THREE HOURS AND MANIPULATING HER TO "CAPITULATE."  THE PROSECUTOR ACCUSED DEFENSE COUNSEL OF TRYING TO CONFUSE *RES GESTAE* WITNESS DARRELL SMITH.  THE PROSECUTOR PROCLAIMED A HIGHER ETHICAL STANDARD THAN THE DEFENSE.

    F.     CUMULATIVE ERROR.

II.   TRIAL COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL.

    A.   TRIAL COUNSEL FAILED TO MAKE AN OPENING STATEMENT.

    B.   TRIAL COUNSEL FAILED TO OBJECT TO THE REPEATED PROSECUTORIAL MISCONDUCT.

    C.   TRIAL COUNSEL FAILED TO OBJECT TO THE ADMISSION OF INADMISSIBLE, PREJUDICIAL EVIDENCE.

    D.   TRIAL COUNSEL HAD A POLICE DETECTIVE READ MR. GORDON'S CRIMINAL RECORD TO THE JURY.

III.   THE TRIAL COURT PROHIBITED MR. GORDON FROM CROSS-EXAMINING THE COMPLAINANT ON WHETHER OR NOT MR. GORDON DID ANYTHING TO HER.   THE TRIAL COURT PROHIBITED MR. GORDON FROM CROSS-EXAMINING THE COMPLAINANT ON HER HISTORY OF TELLING THE TRUTH OR TELLING LIES.

IV.   THE TRIAL COURT ALLOWED THE PROSECUTION TO ADMIT THE PORTION OF MR. GORDON'S STATEMENT THAT FOLLOWED HIS REQUEST FOR COUNSEL.   THE TRIAL COURT DENIED MR. GORDON HIS RIGHT TO COUNSEL AND HIS RIGHT TO REMAIN SILENT.

(Defendant-Appellant's Brief, found in Michigan Court of Appeals Record, ECF No. 21).

On December 23, 2008, the Michigan Court of Appeals issued its decision rejecting all petitioner's arguments and affirming his conviction.  (12/23/08 Op., ECF No. 21).  Petitioner raised the same issues in his application for leave to appeal.  On September 11, 2009, Michigan Supreme Court denied leave to appeal.  (9/11/09 Order, ECF No. 22).  On September 13, 2010, petitioner filed his habeas corpus petition.

## Discussion

**I.  Prosecutorial Misconduct.**

Petitioner argues that various instances of prosecutorial misconduct deprived him of a fair trial.  The scope of review in a habeas action regarding allegations of prosecutorial misconduct is narrow.  "Petitioner's burden on habeas review is quite a substantial one."  *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  This court does "not possess supervisory powers over state court trials."  *Id.*  "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority."  *Id.*  "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.'"  *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (" '[T]he appropriate standard of review for ... a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.' ") (quoting *Darden*, 477 U.S. at 181).  To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181; *see Parker v. Matthews*, 132 S. Ct. at 2153; *Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012).

In ground I, petitioner claims five instances of prosecutorial misconduct and a related claim of cumulative error.

>    A.    The prosecutor and the detective "rehearsed the complainant" through her testimony before trial and prosecution or an agent of the prosecution gave Alicia Hockaday a teddy bear to hold during her testimony.

>    B.    The prosecutor improperly used pretrial, hearsay statements of Darrell Smith and led him to give incriminating testimony.

-25-

C.    The prosecutor interjected highly prejudicial hearsay statements into the proceedings.

D.    The prosecutor elicited testimony from Detective Rogers that petitioner requested counsel in violation of petitioner's right to counsel and right to remain silent.

E.    Prosecutorial misconduct in closing argument indicating that defense counsel kept Alicia Hockaday on the stand for three hours and manipulated her to "capitulate," attempting to confuse Darrell Smith, and claiming a higher ethical standard than defense counsel.

F.    Cumulative Error.

(Petition, ECF No. 1, PageID.23-32).

The Michigan Court of Appeals held that the instances of alleged prosecutorial misconduct individually and cumulatively did not deprive petitioner of a fair trial in violation of his rights under the Due Process Clause.  (ECF. No. 21, Op. at 1-4). Because the Michigan Court of Appeals rejected petitioner's claims for lack of merit, petitioner faces the significant additional hurdle of demonstrating that the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonble determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A.    <u>Rehearsed Testimony and Victim's Possession of a Teddy Bear</u>

Petitioner's initial claims of prosecutorial misconduct on appeal were that the prosecutor and the detective "rehearsed the complainant" through her testimony before trial and prosecution or an agent of the prosecution gave Alicia Hockaday a teddy bear to hold during her testimony.  (Petition at 5, ECF No. 1, PageID.5; ECF No. 1-1,

PageID.23-25).   The Michigan Court of Appeals found no prosecutorial misconduct related to the victim testifying holding a teddy bear.   The prosecutor and the police were not responsible for giving the victim the teddy bear.   Further, even assuming that they had done so, there was no authority that such action would constitute misconduct. (*See* Op. at 1).

The Court of Appeals likewise rejected petitioner's rehearsed testimony argument.   The mentally impaired victim functioned at the level of a seven or eight year old and had an IQ in the mid to high 40s.   The use of leading questions posed to the child-like victim did not constitute misconduct.   She had been instructed to tell the truth.   (*See* Op. at 2).

Petitioner has not shown that the decision of the Michigan Court of Appeals rejecting these claims of prosecutorial misconduct was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. 2254(d).

B.  Hearsay in the Questioning of Darrell Smith

Petitioner's next claim of prosecutorial misconduct, that the prosecutor "improperly used pretrial, hearsay statements of Darrell Smith and led him to give incriminating testimony" (ECF No. 1-1, PageID.25-26), fares no better.   The Court of Appeals found that the prosecutor committed an error under the Michigan Rules of Evidence in introducing "hearsay testimony when he asked witness Darrell Smith,

during direct examination, whether Smith told a detective that he knew that the victim was 'slow.' " (Op. at 2) (citing Mich. R. Evid. 801(d)(1)(A)).  The error was harmless, however, "because Smith's statement to the officer was nevertheless admissible on redirect examination, and an objection and instruction could have cured any prejudice." (Op. at 2 (citing Mich. R. Evid. 801(d)(1)(B) and *People v. Callon*, 256 Mich App 312, 329, 662 N.W.2d 501 (2003)).

The question before this Court is not whether error occurred in the admission of hearsay.  State-law error does not provide a basis for federal habeas relief. 28 U.S.C. § 2254(a).  The decision of the Michigan Court of Appeals finding that the alleged prosecutorial misconduct did not deprive petitioner of a fair trial easily withstands habeas corpus review under applicable standards.  28 U.S.C. § 2254(d).

C.    Hearsay in Questioning of Officer Hartuniewicz

Petitioner's next claim of prosecutorial misconduct is that the prosecutor interjected prejudicial hearsay statements into the proceedings.  (ECF No. 1-1, PageID.26-28).  The Michigan Court of Appeals rejected petitioner's claim of prosecutorial misconduct based on the prosecutor mentioning Officer Perdue's report in questions posed to Officer Hartuniewicz.  (*See* Op. at 2).  This purported instance of prosecutorial misconduct does not provide a basis for federal habeas corpus relief.  *See* 28 U.S.C. § 2254(d).

D.    Reference to Counsel by Detective

Petitioner's next claim of prosecutorial misconduct is based on a question that the prosecutor posed to Detective Rogers. (ECF No. 1-1, PageID.28-29). The Michigan Court of Appeals rejected petitioner's argument that the prosecutor improperly elicited testimony at trial that defendant had invoked his right to counsel while he was being interviewed by detectives. (*See* Op. at 3).

Petitioner has not shown that the decision of the Michigan Court of Appeals was "contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d).

E.    Closing Argument

Petitioner claims entitlement to habeas corpus relief on the basis of prosecutorial misconduct in closing argument. (ECF No. 1-1, PageID.29-31). The Michigan Court of Appeals rejected petitioner's claim that prosecutorial misconduct in closing argument deprived him of a fair trial:

> [W]ith respect to defendant's claim that the prosecutor denigrated defense counsel by arguing that he kept the victim on the stand for three hours and got her to capitulate, we find no error. Although the prosecutor may not denigrate defense counsel, *Watson*, *supra* at 592; *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002), the prosecutor specifically stated that, "I mean no slight to [defense counsel] here ... any attorney can get up and get [this victim] spinning in her chair." The prosecutor's argument was based on the evidence of the victim's mental impairment and the reasonable inferences drawn from that evidence; it was a permissible response to the evidence presented a trial, that is, to the victim's inconsistent testimony. *People v Jones*, 468

-29-

Mich 345, 352-353; 662 N.W.2d 376 (2003).  Therefore, this comment did not improperly denigrate defense counsel.

That said, however, we do find that the prosecutor's argument that he had, "a duty to seek justice," while defense counsel's "role is to zealously represent his client, regardless of anything else" was improper pursuant to *People v Hunt*, 68 Mich App 145, 148; 242 NW2d 45 (1976). Nevertheless, the prosecutor was responding to defense counsel's repeated references to the prosecutor "spinning" the facts, and a prosecutor may respond in a way that might otherwise require reversal, in response to defense counsel's statements.  *Jones*, *supra* at 352-353. Further, in *Hunt*, *supra* at 149, this Court observed that there was a pattern of improper statements which were "unwarranted and wholly unnecessary," and that the prosecutor's improper "remarks were part of a deliberate course of conduct," the prejudicial impact of which could not be cured by an instruction.  This is in stark contrast to the instant case, involving a single, brief responsive statement by the prosecutor, the prejudicial impact of which, if any, could have been cured by an objection and instruction.  *Id.*   Therefore, reversal is not warranted.

(Op. at 3).

State-law error noted by the Michigan Court of Appeals in its supervisory capacity does not provide a basis for federal habeas relief.  Federal habeas corpus relief is only available to a person "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Petitioner has not shown that he is entitled to federal habeas corpus relief.  28 U.S.C. § 2254(d).

F.   Cumulative Effect

Petitioner's last claim of prosecutorial misconduct is that the cumulative effect of all errors listed in his petition deprived him of a fair trial.  (ECF No. 1-1, PageID.31-32).  The Court of Appeals rejected petitioner's argument that the "cumulative effect" of prosecutorial misconduct deprived him of a fair trial.  (*See* Op. at 4).

The decision of the Michigan Court of Appeals rejecting petitioner's prosecutorial misconduct claims was not "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," and it was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Further, under settled Sixth Circuit authority, a claim that the cumulative effect of errors rendered a trial fundamentally unfair is "not cognizable" after AEDPA. *See Shepard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011); *Moore v. Parker*, 425 F.3d 220, 256 (6th Cir. 2005); *accord Haunch v. Berghuis*, 469 F. App'x 418, 422 (6th Cir. 2012). "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Delo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Maryland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012). Moreover, because the individual claims are without merit, petitioner cannot show that any cumulative error violated his constitutional rights. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

## II. Ineffective Assistance of Counsel

Ground II of the habeas corpus petition is a repetition of the four claims of ineffective assistance of trial counsel raised on direct appeal: trial counsel failed to make an opening statement; trial counsel failed to object to alleged instances of prosecutorial misconduct; trial counsel failed to object to the admission of inadmissible, prejudicial evidence; and trial counsel had a detective read petitioner's criminal record

to the jury.  (Petition at 7, ECF No. 1, PageID.7; ECF No. 1-1, PageID.32-39).  The Michigan Court of Appeals determined that each of petitioner's claims of ineffective assistance of counsel lacked merit.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  Petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced petitioner resulting in an unreliable or fundamentally unfair outcome.  *Id.* at 687-88.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  On the prejudice prong, "[petitioner] must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Because the Michigan Court of Appeals decided petitioner's claims of ineffective assistance of counsel on the merits, its decision on each claim must be afforded deference under AEDPA.  *See Burt v. Titlow*, 134 S. Ct. at 15-18; *Harrington v. Richter*, 562 U.S. at 98-101.  To receive habeas relief, petitioner must demonstrate that the state court's decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington.  See Bell v. Cone*, 535 U.S. at 698-99.

Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, petitioner must show that the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586-87 (6th Cir. 2012). This creates a "high burden" for petitioner. *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Hodges v. Colson*, 727 F.3d 517, 534 (6th Cir. 2013). "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Woods v. Donald*, 135 S. Ct. at 1376; *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*).

The question before this Court, then, is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Premo v. Moore*, 562 U.S. at 123; *see McGowan v. Burt*, 788 F.3d 510, 515 (6th Cir. 2015). Petitioner must show that the state courts' ruling on the claim being presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. at 103); *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (*per curiam*).

-33-

A.   <u>Opening Statement</u>

Petitioner argues that his trial counsel was constitutionally ineffective by not making an opening statement.  (ECF No. 1-1, PageID.33-34).  The Michigan Court of Appeals held that defense counsel's strategic decision to waive opening statement was not ineffective assistance of counsel, particularly in light of counsel's extensive closing argument.  (Op. at 4; *see also id.* ("[D]efense counsel's decision to waive opening statement 'can rarely, if ever, be the basis of a successful claim of ineffective assistance of counsel.'" (quoting *People v Pawelczak*, 125 Mich App 231, 242; 336 NW2d 453 (1983)).

Petitioner does not come close to satisfying his burden under the doubly deferential standard of review.  28 U.S.C. § 2254(d)(1).

B.   <u>Failure to Object to Prosecutorial Misconduct</u>

Petitioner's next claim of ineffective assistance of counsel is that counsel failed to object to repeated instances of prosecutorial misconduct.  (ECF No. 1-1, PageID.35). The Michigan Court of Appeals rejected this claim, noting that the majority of claims of prosecutorial misconduct were meritless, and that petitioner failed to show that the remaining errors, "comparatively minor nature," were harmful.  (Op. at 4).

Upon review, this Court finds no error in the Michigan Court of Appeals' determination that petitioner's counsel was not ineffective.  Accordingly, its decision easily passes review under 28 U.S.C. § 2254(d)(1).

C.   Failure to Object to the Admission of Inadmissible, Prejudicial Evidence

Petitioner argues that his trial counsel was ineffective in failing to object to the admission of inadmissible, prejudicial evidence.  (ECF No. 1-1, PageID.35-38).  The Court of Appeals rejected this claim:

> The challenged statements relayed information allegedly provided by the other man involved in this incident, and his statements implicated defendant.  Defendant fails to cite the specific statements that he claims were erroneously admitted.  *Kelly*, *supra* at 640-641.  However, upon reviewing the transcript, we find that the references by the detective were not admitted as substantial evidence to establish their truth; rather, they were admitted merely as context for defendant's answers to the officer's interview questions.  *Johnson*, *supra* at 599.

(Op. at 4).  Petitioner has not addressed, much less carried his burden under 28 U.S.C. §2254(d)(1).

D.   Criminal History

Petitioner's remaining claim of ineffective assistance of counsel is based on the questioning of Detective Rogers regarding petitioner's criminal record.  (ECF No. 1-1, PageID.38-39).  The Michigan Court of Appeals rejected this argument.

> [T]he record reflects that after defendant's tape-recorded interview was held to be admissible, defense counsel decided to use references to defendant's past record during the interview to his advantage, by attempting to show that none of defendant's previous crimes involved assault or criminal sexual conduct.  This was a matter of sound trial strategy.  *People v Rodgers*, 248 Mich App 702, 716, 645 NW2d 294 (2001).  Further, defendant has abandoned his argument regarding the reference to the warrant for his arrest because he failed to adequately brief the issue.  *Kelly*, *supra* at 640-641, 588 NW2d 480.

(Op. at 5).

The Michigan Court of Appeals' decision is sound. Petitioner cannot meet his burden under 28 U.S.C. § 2254(d)(1).

## III.    Confrontation Clause

In ground III, petitioner argues that Judge Leiber's rulings violated his rights under the Confrontation Clause.  (Petition at 8, ECF No. 1, PageID.8; ECF No. 1-1, PageID.39-40).  "The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015) (quoting U.S. CONST. amend. VI).  The Supreme Court's "Confrontation Clause cases fall in two broad categories: cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or the trial court on the scope of cross-examination."  *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) *(per curiam)*.  Petitioner's challenges to the trial court's rulings fall within the latter category.

Cross-examination is a "primary interest" secured by the Confrontation Clause. *Douglas v. Alabama*, 380 U.S. 415, 418 (1965).  "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20.  Petitioner argues that the trial judge's ruling unfairly thwarted his effort to cross-examine the victim.

Trial judges retain wide latitude in imposing reasonable restrictions on cross-examination.  *See, e.g., Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  These restrictions may arise from "concerns about, among other things, harassment,

prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.*

The Michigan Court of Appeals rejected petitioner's Confrontation Clause claims. It noted that the right to cross-examine a witness is not unlimited and that the trial court has broad discretion to limit cross-examination because of harassment, prejudice, confusion, repetitive or irrelevant questions, or concerns for the witness's safety. (Op. at 5). It found no confrontation clause violation because the trial court did not impose limits on cross-examination that prevented petitioner from presenting to the jury facts relevant to bias, prejudice, or lack of credibility. (*See* Op. at 5-6).

The decision of the Michigan Court of Appeals finding no constitutional violation easily withstands scrutiny under 28 U.S.C. § 2254(d).

## IV.   Custodial Statement

Petitioner argues that the trial court should have suppressed his second statement to Detective Rogers. (Petition at 10, ECF No. 1, PageID.10, ECF No. 1-1, PageID.40-41). The *Miranda* requirements are clearly established:

> In *Miranda v. Arizona*, the [Supreme] Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney. The Court also indicated the procedures to be followed subsequent to the warnings. If the accused indicates that he wishes to remain silent, "the interrogation must cease." If he requests counsel, "the interrogation must cease until an attorney is present."

*Edwards v. Arizona*, 451 U.S. 477, 481 (1981) (quoting *Miranda v. Arizona*, 384 U.S.436, 479 (1966) (internal citations omitted).

A request for counsel must be clear and unequivocal. *Davis v. United States*, 512 U.S. 452, 459-62 (1994). In *Davis*, "the Court declined 'to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney.'" *McKinney v. Hoffner,* No. 15-1374, __ F.3d __, 2016 WL 3902645, at *6 (6th Cir. July 19, 2016) (quoting *Davis*, 512 U.S. at 459, internal citations omitted). "*Davis* represents the governing clearly established federal law." *McKinney v. Hoffner,* 2016 WL 3902645, at *6  Because *Davis* is a "general rule," Michigan's courts "had 'more leeway' to make a case-by-case determination." *Id.* at * 7 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The Michigan Court of Appeals rejected petitioner's claim that the trial court had violated his rights by admitting this statement. It found that petitioner did not make an unequivocal request for counsel. (*See* Op. at 6-7).

This Court finds no error in the decision of the Michigan Court of Appeals. Accordingly, it easily withstands scrutiny under the deferential standard of review. 28 U.S.C. § 2254(d).

## V.   Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather,

-38-

the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.*   Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDonnell*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, the Court has examined each of petitioner's claims under the *Slack* standard.

Petitioner cannot demonstrate that reasonable jurists would find that the denial of habeas corpus relief on each of the grounds raised in his petition is debatable or wrong. *See Slack*, 529 U.S. at 484.  Accordingly, the  Court will enter an order denying petitioner a certificate of appealability.

## Conclusion

For the foregoing reasons, a judgment will enter dismissing the petition with prejudice because it does not provide a basis for federal habeas corpus relief under 28 U.S.C. § 2254.

Dated: <u>August 23, 2016</u>                          <u>/s/ Robert Holmes Bell</u>
                                                        ROBERT HOLMES BELL
                                                        UNITED STATES DISTRICT JUDGE